UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 03-2921(DSD/SRN)

Eileen Fourré Bernet,

        Plaintiff,

v.

CITIES Credit Union,
a Minnesota credit union,

        Defendant.

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT**

    James R. Bettenburg, Esq. and Bettenburg Law Office, 2334 University Avenue, Suite 190, St. Paul, MN 55114, counsel for plaintiff.

    Frederick E. Finch, Esq. and Bassford Remele, P.A., 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, counsel for defendant.

This is an action for a declaratory judgment brought by plaintiff Eileen Fourré Bernet ("Bernet"), which would require her former employer, Cities Credit Union ("Cities"), to pay health insurance premiums and pay for life and disability insurance benefits until she is 65, and also reimburse her for payments she has made to maintain those fringe benefits. After Cities removed the case to this court, it answered and counter-claimed for amounts it had paid for the benefits after Bernet left its employ.

The case was tried to the court on June 27, 2005, and after hearing the testimony, receiving exhibits and receiving the written arguments of counsel, the court makes the following:

**FINDINGS OF FACT**

1. The defendant, Cities, is a Minnesota credit union incorporated under Minnesota Statutes Chapter 52. Its offices are located in Ramsey County, Minnesota. Prior to February 21, 1995, Cities was known as the St. Paul Telco Credit Union.

2. Bernet is an individual who resides in Ramsey County, Minnesota.

3. Bernet was employed by Cities from January 1980 through March 31, 2002. From 1990 through January 31, 2002, Bernet served as the president, general manger and treasurer of Cities. She resigned from Cities in 2002.

4. Beginning in 1980, Cities agreed to purchase from Blue Cross and Blue Shield of Minnesota and pay for the premiums on individual health insurance plans covering Bernet and Ralph Nelson, who were the only employees of Cities at that time.

5. Beginning in about 1985, Cities instituted a group health insurance plan for its employees, but Bernet declined to participate. Cities agreed to continue to pay the premium on Bernet's Blue Cross/Blue Shield policy.

6.  Cities continued to pay the premiums on Bernet's Blue Cross/Blue Shield policy until September 2002.

7.  Prior to February 1995, Cities purchased group life insurance and group disability insurance policies covering its employees.

8.  In February 1995, the group life insurance and group long term disability insurance policies covering employees of Cities were issued by CUNA Mutual Insurance Company

9.  After July 1, 2001, the group life insurance and group long term disability insurance policies covering employees of Cities were issued by GE Group Life Insurance Company.

10. At all material times, the group life insurance policies and group disability insurance policies provided by Cities to its employees, including Bernet, limited coverage to employees of Cities who were actively at work (or not working because they were disabled under the terms of the policy).

11. Beginning in 1986, Bernet was diagnosed with multiple sclerosis, which is a chronic progressive degenerative disease which affects the central nervous system.  Notwithstanding this disease, Bernet was able to perform all of the duties of her position at all material times.

12. Beginning in 1986, Bernet advised Cities' board of directors that she had been diagnosed with multiple sclerosis. Bernet requested no modification of her job because of the disease.

13. The board of directors of Cities was, at all material times, made up of members of the credit union, most of whom were employees of Northwestern Bell Telephone Company and its successors, U S West and Qwest. Members of the board of directors were not required to have any training or experience in running a financial institution and most board members had no such training or experience.

14. Bernet set the agenda for board of directors meetings and reviewed and distributed minutes of board of directors meetings.

15. Beginning in about 1992, Bernet recommended that the board of directors establish committees of directors to deal with issues of concern to Cities. One such committee was the salary committee. The salary committee was charged with reviewing the president's performance and recommending an appropriate salary and benefits for the president.

16. The salary committee operated informally. There was no evidence that it ever kept records of its meetings or issued written reports or recommendations to the board of directors.

17. Although the board of directors, at the request of Bernet, frequently adopted resolutions concerning business

4

decisions of Cities, it rarely adopted resolutions setting the salary or benefits of the president of Cities.

18.  Between 1992 and 1995, Cities and Bernet considered the problems with a proposed or anticipated merger with a larger credit union.  Bernet, as well as the chairman of the personnel committee (which also acted as a salary committee), expressed concern that Bernet might not be qualified to obtain health insurance, life insurance or disability insurance coverages in the event there was such a merger or otherwise ended her employment with Cities for any reason because of her medical condition.

19.  The matter of insurance was discussed with the chair of the salary committee, Ann Gigrich, who also served as secretary of the credit union.  In order to insure Bernet's continued service with the credit union as president, Ann Gigrich arranged to provide a written contract which would protect Bernet by providing a continuation of health, life and disability insurance coverage until such age as she was entitled to social security benefits.

20.  In 1992, Cities, through its salary committee, engaged the services of Rhonda Cooke of Cooke/Andres, Inc., a human resources consulting firm for credit unions.

21.  In late 1994, Rhonda Cooke prepared an employee incentive plan, and during that same period was asked by Ann Gigrich to prepare a written employment agreement for Bernet which would also

5

ensure continuing insurance coverages to be paid for by Cities. Pursuant to that request, Rhonda Cooke drafted and forwarded to Ann Gigrich a written employment agreement in the form of a letter from Cities to Bernet confirming the terms of the employment agreement between the parties containing several provisions relating to her employment, including paragraph 7 thereof which provided:

> 7. The President shall participate in all St. Paul Telco's benefit plans that are available to all employees, unless a separate benefit plan is in effect specifically for the President. In addition, St. Paul Telco agrees to provide health insurance, disability insurance and life insurance coverage until such age that social security and/or medicare goes into effect and thereafter to pay on the premium for supplemental health insurance. In the event of partial disability prior to standard social security in effect, Telco will continue to pay the premiums for appropriate benefits programs stated above so that the President incurs no loss of coverage.

22. The written employment agreement as drafted by Rhonda Cooke was then considered by the salary committee made up of board members including the board chairman, Martin Fleischhacker. The employment agreement was unanimously approved by the salary committee and presented to the chairman of the board of directors of Cities immediately following the annual membership meeting on February 21, 1995. The employment agreement was signed on that date by Martin Fleischhacker acting as the chairman of the board of directors.

23. The signed contract was then presented to Bernet and was placed in her personnel file at Cities' place of business.

24. With each change of the chairmanship of Cities' board of directors, Bernet would inform the incoming chairman of the existence of the contract and would offer the opportunity to read it or to provide a copy. Only one incoming chairman, Dan Gavin, who succeeded Martin Fleischhacker, reviewed the contract, but did not question or dispute it. Cities presented no evidence to refute that testimony.

25. For several years, at least from 1990 through 2002, compensation and benefits for Bernet was fixed by the salary committee who conducted an evaluation of Bernet's past performance, considered her physical condition and needs and the recommendations of Rhonda Cooke with respect to the comparable salaries statewide.

26. The matter of the compensation and benefits for the president had been fully delegated to the salary committee, all of whom were members of the board of directors, including the chairman of the board. Customarily and routinely there was no formal action taken by the board of directors specifically to fix the president's compensation. This method had been adopted and accepted by the credit union over the years and substantially complies with the requirements of Minn. Stat. §52.09 subd. 2 (8).

27.  The monthly cost of premiums on Bernet's Blue Cross/Blue Shield medical coverage was as follows:

| | | |
|---|---|---|
| April 2002 to March 2003 | - | $320.50 |
| April 2003 to March 2004 | - | $382.00 |
| April 2004 to March 2005 | - | $430.50 |
| April 2005 to date | - | $487.00 |

28.  Bernet was born on October 28, 1956 and is now 48 years old.

**CONCLUSIONS OF LAW**

1.  The court has jurisdiction of this matter under 28 USC § 1331, 29 U.S.C. § 1132(e).

2.  The counterclaim of defendant was dismissed by stipulation.

3.  The written employment agreement dated January 1, 1995 and executed by Cities' chairman of the board on February 21, 1995, is a valid and enforceable employment contract.

4.  To the extent an employment contract provides pension or welfare benefits through a plan or program covered by ERISA, the court must look to the ERISA statute and the case law construing it and not state contract law. Stearns v. NCR Corp., 297 F.3d 706, 710 (8th Cir. 2002).

5.  The life, disability and health insurance benefits promised to plaintiff in the 1995 Agreement were provided to Bernet through ERISA plans.

6.  Bernet's claims in this lawsuit are therefore claims to recover benefits due under a plan, to enforce her rights under a plan or to clarify her rights to future benefits under a plan within the meaning of 29 U.S.C. § 1132(a)(1).

7.  Bernet's state law claims are preempted by 29 U.S.C. § 1144(a) insofar as the state claims relate to the employee benefit plans at issue.

8.  At the outset, the court must "define the contours of the ERISA plan[s] [it is] construing." Stearns, 297 F.3d at 711.

9.  Bernet's life, disability and health insurance benefits were provided under separate plans.

10.  The documents setting forth the terms of the life insurance plan include the 1995 Agreement and the "Group Term Life Insurance Certificate of Insurance" (Def.'s Ex. 14).

11.  The documents setting forth the terms of the disability insurance plan include the 1995 Agreement and the "Long Term Disability Certificate of Insurance" (Def.'s Ex. 15).

12.  The document setting forth the terms of the health insurance plan is the 1995 Agreement. No other document regarding the health insurance plan was adduced at trial.

13.  "Claims for ERISA benefits are determined by construing the plan in toto...." Stearns, 297 F.3d at 710.

14.  The intent to vest welfare plan benefits must be clearly expressed. See Stearns, 297 F.3d at 712. Construing together the 1995 Agreement and the certificate of insurance, plaintiff is not entitled to vested benefits because the certificate provides that plaintiff "will cease to be insured" on "[t]he date employment terminates." (Def.'s Ex. 15 ¶ 7.1.) Such a provision is inconsistent with a clear expression of vested benefits.

15.  For the same reasons, Bernet is not entitled to vested benefits under the life insurance plan. (Def.'s Ex. 14 ¶ 7.1.)

16.  Plaintiff is entitled to vested health insurance benefits under the health plan. Basic principles of contract interpretation are relevant in construing an ERISA plan. See Stearns, 297 F.3d at 710. In Minnesota, terms of a written contract are given their plain and ordinary meaning. See Turner v. Alpha Phi Sorority House, 276 N.W.2d 63, 67 (1979). The plan provides that Cities will "provide health insurance ... until such age that social security and/or medicare goes into effect and thereafter to pay the [sic] only the premium for supplemental health insurance." The plain and ordinary meaning of this language is that Cities will provide Bernet with health insurance until she begins receiving social security retirement or Medicare health insurance benefits.

After that, Cities will provide plaintiff with supplemental health insurance.

17. Bernet is entitled to specific performance of those provisions pertaining to the continuation of health insurance coverage at Minnesota Blue Cross Blue Shield, and the premiums are to be continued to be paid by Cities until such time as Bernet becomes covered under some other equivalent insurance coverage or until she is entitled to obtain social security benefits at age 65. Thereafter, Cities is obligated to make the payments on a supplemental health insurance policy to provide a continuation of coverage as it now exists.

18. Bernet is entitled to reimbursement of the cost of the said health insurance policy for amounts paid by Bernet for such coverage in the amount of $14,274.

**ORDER FOR JUDGMENT**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 25, 2005

                                        s/David S. Doty
                                        David S. Doty, Judge
                                        United States District Court